IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| CYNTHIA HARMON, FRAZIER SHACK, YVETTA HORSFORD-SMITH, SHONDALE ALFORD, and MELVIN RILEY, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | 1:13cv1597 (LMB/TRJ) |
| v. | ) ) ) | |
| DYNCORP INTERNATIONAL, INC, a.k.a. DYNCORP INTERNATIONA, LLC, | ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION

Before the Court is Defendant's Motion to Dismiss Plaintiffs' Second Amended

Complaint.  For the reasons stated during the oral argument of the motion and in this opinion, the

motion will be granted.

## I.  BACKGROUND

On December 31, 2013, plaintiffs filed their first Complaint against the parent company

of their former employer,[1] alleging that the defendant refused to pay them for work performed

and discriminated against them on various bases, including race.  Defendant timely filed a

motion to dismiss the Complaint.  Rather than oppose the motion, plaintiffs filed their First

Amended Complaint ("FAC").

In the FAC, plaintiffs asserted common law claims and claims under 42 U.S.C. § 1981,

which prohibits discrimination in contracting.  The FAC requested aggregate actual damages of

---

[1] Each complaint has named the defendant differently.  See Part II(B), infra.  The period that
should appear after "Inc" and the "l" that should appear in "DynCorp Internationa, LLC" were
missing from the caption of the most recent version of the Complaint.  This Opinion uses the
proper names for these entities.

$1,001,515.00 and punitive damages of $5 million.  Defendant moved to dismiss the FAC on several grounds, arguing primarily that the written employment agreements with each plaintiff contained an enforceable forum selection clause and that the named defendant was an entity distinct from plaintiffs' actual employer.

On July 9, 2014, the Court held a hearing on the motion to dismiss at which it dismissed the entire FAC without prejudice.  In doing so, the Court expressed a number of concerns regarding the FAC, including that none of the plaintiffs reside in this district or have had any meaningful contact with this district and that the claims of the five plaintiffs were sufficiently different that there was no proper basis for them to be in one lawsuit.  Tr. Mot. Hr'g 3-4, July 9, 2014.  The Court also expressed concern that the wrong defendant had been named and that, although only one defendant was named in the caption, the FAC often referred to "defendants," in the plural.  Id. at 4.  In addition, the Court chided plaintiffs for the excessively high punitive damages claim, which was likely tainting the case against settlement.  Id. at 5.  Lastly, the Court found that the FAC was "so vaguely pled" as to suggest that counsel had not adequately investigated these five plaintiffs and their claims.  Id. at 7.  For these reasons, the Court dismissed the FAC without prejudice and gave plaintiffs 30 days to refile.  Id. at 7-8.

On September 11, 2014, after receiving a one-month extension of their deadline, plaintiffs filed their Second Amended Complaint under seal, adding a cause of action under the federal False Claims Act.  The Court dismissed this complaint and ordered plaintiffs to refile a second amended complaint omitting the False Claims Act allegations.  Order at 2, Oct. 8, 2014.  Plaintiffs then filed a revised version of the Second Amended Complaint ("SAC"), which raises all of the same claims as the FAC had and which failed to correct most of the Court's concerns.  Defendant has again moved to dismiss the entire complaint.

2

Plaintiffs Cynthia Harmon ("Harmon"), Frazier Shack ("Shack"), Yvetta Horsford Smith ("Smith"), Shondale Alford ("Alford"), and Melvin Riley ("Riley") are former employees of DynCorp FZ-LLC ("DynCorp FZ" or "DIFZ"), a foreign entity established in Dubai, United Arab Emirates.  Second Am. Compl. ("SAC") ¶ 14(d).  Plaintiffs allege that DIFZ is controlled by either DynCorp International Inc. ("DynCorp Inc.") or by DynCorp Inc.'s wholly-owned subsidiary, DynCorp International LLC ("DynCorp LLC").  SAC ¶¶ 12, 14(a), 14(e); see also SAC ¶¶ 75, 77.  DynCorp Inc., the only named defendant in this action, is a Delaware corporation headquartered in Virginia.  SAC ¶ 14(a).  DynCorp LLC is a Delaware company headquartered in Fort Worth, Texas.  SAC ¶ 12.

All the plaintiffs are African-Americans who signed written Foreign Service Employment Agreements ("FSEAs" or "written agreements") to work for DynCorp FZ in Afghanistan in support of the LOGCAP IV contract with the U.S. military.[2]  SAC ¶¶ 12, 15.  Plaintiffs allege that they were promoted to positions for which they were never paid and that they were discriminated against on various bases, including race.  SAC ¶ 15.  Other than those similarities, each plaintiff's work for DynCorp FZ involved different intervals between 2009 and 2013, different job titles and duties, and different supervisors.

---

[2] The Court may consider plaintiffs' FSEAs attached to defendant's brief without converting the motion to dismiss into one for summary judgment because the written employment agreements are referenced throughout the SAC and are an integral component of this case.  See Phillips v. LCI Int'l, Inc., 190 F.3d 609, 618 (4th Cir. 1999) (observing that a court may consider certain documents at the motion to dismiss stage that are "integral to and explicitly relied on in the complaint," provided that "the plaintiffs do not challenge [their] authenticity").  Plaintiffs have all submitted declarations, attached to their opposition brief, acknowledging the authenticity of the FSEAs.

Harmon, a resident of Georgia, began working in Kandahar, Afghanistan, in November 2009[3] as a Help Desk Specialist pursuant to her FSEA with DynCorp FZ. SAC ¶ 17; Mem. Supp. Def.'s Mot. Dismiss Pls.' Second Am. Compl. ("Def.'s Mem."), Ex. 1, at 1 (Harmon's December 2009 FSEA); Mem. Supp. Pls.' Opp'n Def.'s Mot. Dismiss ("Pls.' Opp'n"), Ex. 1 ¶ 3 (Harmon's Declaration). She was recruited for this job while working in Afghanistan for another employer, KBR. SAC ¶ 17. Harmon alleges that she was promoted to Aviation Supervisor in June 2011 and then eventually promoted to Flight Operations Supervisor but was never paid for either position. SAC ¶ 18. When Harmon complained to unidentified individuals in management about her incorrect salary, she was threatened with removal from her private sleeping quarters and placement in a sleeping car with five others. SAC ¶ 20. At some point, Harmon also complained to "headquarters in Fort Worth, Texas" regarding her pay issues, but the company denied her claim. SAC ¶ 19. In November 2011, Harmon voluntarily resigned, although she alleges that defendant's refusal to properly pay her constituted a wrongful constructive discharge. SAC ¶¶ 20-21. She now seeks $326,975 in lost wages.[4] SAC ¶ 22.

Smith, a resident of Texas, began working in Kandahar in November 2010 as a Movement Control Coordinator pursuant to a FSEA with DynCorp LLC. SAC ¶¶ 9, 23; Def.'s

---

[3] Although the Second Amended Complaint alleges that Harmon's employment with DynCorp FZ began in November 2009, her FSEA has an effective start date of December 11, 2009. Mem. Supp. Def.'s Mot. Dismiss Pls.' Second Am. Compl., Ex. 1, at 8.

[4] Harmon's lost wages calculation includes back pay for the difference between her Help Desk Specialist salary and the salary of an Aviation Supervisor; however, she calculates lost wages reaching back to February 2010 even though she alleges that she began the Aviation Supervisor position in June 2011. See SAC ¶¶ 18, 22. Although Harmon alleges that she is owed back pay for other higher-paying positions as well, namely Lead Supervisor and Flight Operations Supervisor, the SAC does not indicate the time periods during which she occupied these positions or the salary associated with either position, and her damages calculation does not appear to include any amount owed for these positions. In addition, the total amount of lost wages sought includes "an additional year of salary [at the Aviation Supervisor rate] that she would have enjoyed had she not been forced to quit." SAC ¶ 22.

4

Mem., Ex. 3 (Smith's November 2010 FSEA). She accepted the higher-paying position of Billeting Supervisor on June 20, 2011, which required her to transfer employment from DynCorp LLC to DIFZ and to sign a new FSEA.[5] SAC ¶ 23; SAC, Ex. 2 (emails documenting Smith's position change). Smith alleges that she did not begin receiving the increased pay rate until September 2011, two months into her new position. SAC ¶ 23; see Def.'s Mem., Ex. 4 (Smith's 2011 FSEA reflecting an effective date of August 26, 2011). Although Smith's FSEA with DIFZ expired in November 2011, she was rehired by DIFZ as a Transportation Coordinator in January 2012 and signed a new FSEA. SAC ¶ 24; Def.'s Mem., Ex. 5 (Smith's January 2012 FSEA).

Smith further alleges that in February 2012, "DynCorp made her apply for the position of Transportation Supervisor," which would have increased her pay rate by three dollars per hour. SAC ¶ 24. Although the SAC does not state whether she actually received this promotion, Smith alleges that she "was assured she would be paid that amount, but was not, instead being informed that because she had not been employed long-term she could not receive the pay for performing that position." SAC ¶ 24. Smith further alleges that her Supervisor position was terminated in November 2012 in retaliation for her complaints regarding her pay rate. SAC ¶ 24.

In addition, Smith alleges that she was subjected to a racially hostile work environment and that defendant refused to sign her promotion papers for the Transportation Supervisor position, accusing her of obtaining her contract under false pretenses. SAC ¶ 26. At some point in 2012, Smith complained to "headquarters in Fort Worth, Texas," regarding her pay issues but the company denied her claim. SAC ¶ 25. In April 2013, she decided to resign and return to the

---

[5] Although the Second Amended Complaint states that Smith's new position was accompanied by a transfer from DIFZ to DynCorp LLC, SAC ¶ 23, the FSEAs show that it was the other way around, see Def.'s Mem., Exs. 3-4 (Smith's 2010 and 2011 FSEAs); see also SAC, Ex. 2 (emails between Smith and her employer stating that she was transferring to DIFZ for her new position).

United States due to defendant's alleged refusal to pay her as a Supervisor, termination of her

Supervisor position, and refusal to promote her. SAC ¶ 26. Upon her return, she complained to

"headquarters in Virginia," through counsel, regarding the unpaid wages, but her claims were

denied. SAC ¶ 27. Smith now seeks $18,458.76 in lost wages.[6] SAC ¶ 28.

      Shack, a resident of Florida, had been working overseas, including in Iraq and Kuwait,

for 12 years for KBR when he was recruited by DynCorp LLC to work in its Fort Worth, Texas,

offices. SAC ¶ 29; Pls.' Opp'n, Ex. 3 ¶ 3 (Shack's Declaration). After working in Fort Worth

for six months, Shack signed a one-year FSEA with DynCorp FZ in December 2009 to work as a

Site Manager at Kandahar Airfield. SAC ¶ 30; Def.'s Mem., Ex. 6 (Shack's December 2009

FSEA). Shack alleges that in February 2010, he was "sent to Camp Leatherneck as the Regional

Site Manager," a more senior position, which he performed for five months without additional

pay.[7] SAC ¶¶ 30-31. Following the five-month period, Shack was replaced as Regional Site

Manager by a Caucasian employee. SAC ¶ 31. Thereafter, Shack was moved to various camps

and at each new camp, he continued his position as Site Manager.[8] SAC ¶ 33; see Pls.' Opp'n,

Ex. 3 (includes Shack's February 2011 FSEA with DynCorp LLC, which described his position

---

[6] This total is comprised of (1) the difference in pay between the Movement Control Coordinator and the Billeting Supervisor positions for two months and (2) the difference in pay between the Transportation Coordinator and Transportation Supervisor positions for ten months. SAC ¶ 28.

[7] The SAC alleges that a Site Manager's salary is $27 per hour—though Shack's December 2009 FSEA set his salary at $28.55 per hour—and that a Regional Site Manager's salary is $45 per hour. SAC ¶ 31; Def.'s Mem., Ex. 6 ¶ 2 (Shack's December 2009 FSEA). Shack signed a modification to his FSEA raising his salary from $28.55 to $30.13 per hour, effective from April 1, 2010, through the original FSEA's end date in December 2010. Def.'s Mem, Ex. 7 (Shack's April 2010 modification).

[8] Following the end of his FSEA with DIFZ in December 2010, Shack signed a new FSEA with DynCorp LLC, effective from February 2011 to December 2011, which maintained his previous salary of $30.13 per hour. Pls.' Opp'n, Ex. 3 (includes Shack's 2011 FSEA). He then signed a modification of that FSEA, effective May, 13, 2011, which raised his salary to $40 per hour. Id.

as "Site Manager"). When Shack's employment ended in January 2012, he was replaced by a Caucasian employee. SAC ¶ 38.

The Second Amended Complaint alleges three different reasons for the non-renewal of Shack's employment contract at the end of 2011. First, the SAC alleges that "DynCorp refused to renew his contract after a series of false claims by Mike Thomas," a deputy director "who made untrue statements about Frazier Shack for being on a leave for rest and recreation (R&R)." SAC ¶ 33. The SAC next alleges that Shack "was not approved for renewal of his [FSEA] for 2012 because he had been moved three times." SAC ¶ 35. Then, the SAC alleges that Shack "was retaliated against and terminated from employment as a result" of his complaints regarding the "whites-only, good old boy" work culture that he perceived, as well as about the improper pay that he and the other plaintiffs were receiving. SAC ¶¶ 35-37. Following his return to the United States, Shack lodged a complaint in May 2013 to "DynCorp headquarters in Virginia," through counsel, regarding his unpaid wages, but his claim was not resolved in his favor. SAC ¶ 39. He now seeks $294,677.70 in lost wages.[9] SAC ¶ 40.

Alford, a resident of Texas, began working in Afghanistan as a Travel Coordinator in August 2010 pursuant to a one-year FSEA with DynCorp FZ. SAC ¶ 41; Def.'s Mem., Ex. 8 (Alford's August 2010 FSEA). While in Afghanistan, Alford was allegedly asked by an unnamed individual to perform the duties of a Travel Supervisor and a "Flight Ops/Aviation Supervisor," both higher paying positions, which she did for an unspecified length of time

---

[9] This total includes the difference in pay between the alleged Site Manager rate of $27 per hour and the alleged Regional Site Manager rate of $45 per hour for the five-month period beginning in February 2010. SAC ¶¶ 31, 40. This calculation, however, disregards the salary that Shack actually received during the relevant timeframe—$28.55 per hour in February and March 2010 and $30.13 per hour beginning April 1, 2010. Shack's total damages also include an additional year and a half of wages at the alleged Site Manager rate of $27 per hour for the time period immediately following the expiration of his final FSEA. SAC ¶ 40.

without receiving additional pay. SAC ¶ 41. Alford alleges that she applied for a Travel

Supervisor position that became available in November 2010, but the position was given to a

Caucasian woman. SAC ¶ 43. Alford further alleges that she applied for a Travel Supervisor

position on several other occasions but was never granted an interview despite the fact that she

had already performed the duties of the position. SAC ¶ 43. In addition to not receiving a

promotion to Travel Supervisor, she alleges she was "forced to train Paul Rainey, a Caucasian,

on how to perform the job." SAC ¶¶ 44, 50.

Alford alleges that in July 2011, she was "forced to relocate" to Camp Leatherneck to

help establish a Travel Office. SAC ¶ 45. She further alleges that she should have been paid as a

Travel Supervisor for this work and that she was subjected to unspecified "additional

unfavorable treatment." SAC ¶ 45. Moreover, she alleges that "[s]imilarly situated Caucasian

employees were not treated the same way as [she] was treated at Camp Leatherneck." SAC ¶ 47.

The sole example given is that Alford "was required to perform the job of Travel Supervisor and

train others for the supervisory position and pay but was never paid for her services under the

published schedule." SAC ¶ 47. Despite her dissatisfaction with how she was being paid,

Alford nevertheless signed two more FSEAs. On July 27, 2011, she signed a modification to her

August 2010 FSEA extending her employment period for one month but maintaining the same

pay rate. Def.'s Mem., Ex. 9 (Alford's July 2011 modification). She then signed another one-

year FSEA with DynCorp FZ for a Travel Coordinator position, effective September 2011.

Def.'s Mem., Ex. 10 (Alford's September 2011 FSEA).

Alford further alleges she was acting as the Interim Flight Operations Supervisor and the

Interim Travel Supervisor in November 2011 when Assistant Site Manager Douglas Lobdell

allegedly asked whether she would like either position on a more permanent basis, to which she

responded in the affirmative. SAC ¶ 48. Lobdell allegedly informed her that he would begin the process; however, the job was ultimately given to a newly-hired Caucasian woman with less experience. Id. Alford also alleges that the Site Manager verbally threatened her job and constantly stated that she was a problem but never stated why he thought so. Id.

Alford's final FSEA, which again described her position as "Travel Coordinator," was to be in effect from October 2012 to October 2013. Def.'s Mem., Ex. 12 (Alford's October 2012 FSEA); however, her employment was terminated in January 2013 after she had returned to the United States earlier that month on medical leave. SAC ¶ 41. She alleges that she was fired "in retaliation and discrimination for her weight, sex and race."[10] SAC ¶ 51. In either March or May 2013, Alford complained, through counsel, to "DynCorp headquarters in Virginia" regarding her unpaid wages, but her claim was denied. SAC ¶¶ 46, 49. She now seeks $251,704.00 in lost wages.[11] SAC ¶ 51.

Riley, a resident of Alabama, began working in Afghanistan in December 2009[12] as a Billeting Manager pursuant to a one-year FSEA with DynCorp FZ. SAC ¶ 52; Def.'s Mem., Ex. 13 (Riley's December 2009 FSEA). He had been working in Iraq for KBR when he was recruited to work for DIFZ. Pls.' Opp'n, Ex. 5 ¶¶ 3-4 (Riley's Declaration). He signed another one-year FSEA with DynCorp FZ, effective December 2010 to December 2011, in which he

---

[10] This claim of discrimination based on Alford's weight and sex is the only reference in the Second Amended Complaint to that kind of discrimination.

[11] Alford's total damages are comprised of (1) the difference in pay between the Travel Coordinator and Travel Supervisor/Flight Operations Supervisor positions from November 2011 to January 2013 and (2) one year's worth of pay at the Travel Supervisor/Flight Operations Supervisor rate for the period immediately following her termination in January 2013. SAC ¶ 51.

[12] Although the SAC alleges that Riley worked for the defendant starting in December 2010, SAC ¶ 52, he signed a FSEA with DIFZ on December 9, 2009, and it was in effect from December 8, 2009, until December 7, 2010, Def.'s Mem., Ex. 13 (Riley's December 2009 FSEA).

retained his Billeting Manager position at the same pay rate. Def.'s Mem., Ex. 14 (Riley's December 2010 FSEA). Riley alleges that he accepted a promotion to a Site Manager position for a Band 5 base on June 25, 2011, but did not receive the commensurate pay increase until August 2011.[13] SAC ¶¶ 52-53. On August 10, 2011, he was given a new FSEA, this time with DynCorp LLC, reflecting the promotion to Site Manager and the pay raise. SAC ¶ 52; Def.'s Mem., Ex. 15 (Riley's August 2011 FSEA).

On August 18, 2011, Riley was allegedly reassigned to be the Site Manager of a Band 4 base, "FOB Geronimo," which entitled him to another pay increase. SAC ¶ 54. Riley alleges that he never received this increase. SAC ¶ 54. At FOB Geronimo, Riley found problems with the equipment and with functions not being performed in accordance with the LOGCAP IV contract. SAC ¶¶ 54-55. He brought these issues into compliance, causing some non-African-American employees to be disciplined for the noncompliance. SAC ¶ 55. These unnamed employees had friends in "higher management" and sought to retaliate against Riley by having him fired. SAC ¶ 55. Riley's employment was terminated "without warning" in October 2011. SAC ¶¶ 54, 58. Before his employment was terminated, Riley alleges that he had "repeatedly requested higher management" to correct his pay rate and provide him with back pay. SAC ¶ 56. He further alleges that he complained to "DynCorp headquarters in Virginia," through counsel, in May 2013 regarding his improper pay, but his claim was denied. SAC ¶ 57. He now seeks $309,699.23 in lost wages.[14] SAC ¶ 60.

---

[13] Two paragraphs later, however, the Second Amended Complaint alleges that Riley was "paid $27.62 from June 25, 2011." SAC ¶ 54. This amount reflects the increased pay rate that Riley alleges he did not begin receiving until August 2011. SAC ¶ 52.

[14] This total is comprised of four components. First, Riley seeks the difference in pay for a Billeting Manager and a Band 5 Site Manager for June through August 2011. SAC ¶ 60. Second, Riley seeks the difference in pay between a Band 5 Site Manager and a Band 4 Site Manager for the two-month period between his reassignment to FOB Geronimo in August 2011

The Second Amended Complaint consists of seven counts captioned as follows:

| | |
|---|---|
| Count I: | Breach of Contract, Express and Implied |
| Count II: | Racial Discrimination and Retaliation in contracting under 42 U.S.C. § 1981 |
| Count III: | Intentional and negligent Misrepresentation and Fraud |
| Count IV: | Breach of Covenant of Good Faith and Fair Dealing |
| Count V: | Promissory Estoppel/Detrimental Reliance |
| Count VI: | Unjust Enrichment |
| Count VII: | Quantum Meruit |

As in their previous two complaints, plaintiffs seek aggregate actual damages of $1,001,515 and

punitive damages of $5 million, as well as attorneys' fees under 42 U.S.C. § 1988.[15]   Defendant

has again moved to dismiss the entire Second Amended Complaint on several grounds.

## II.   DISCUSSION

### A.   Standard of Review

To survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss, a complaint must allege facts

that "state a plausible claim for relief" and "are sufficient to raise a right to relief above the

speculative level." Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012) (quoting Ashcroft v.

Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  While

a plaintiff "need not forecast evidence sufficient to prove the elements of the claim," the

complaint must "allege sufficient facts to establish those elements." Id. (quoting Robertson v.

Sea Pines Real Estate Cos., 679 F.3d 278, 291 (4th Cir. 2012)) (internal quotation marks

omitted).  Thus, "a formulaic recitation of the elements of a cause of action will not do."

Twombly, 550 U.S. at 555.

---

and his termination in October 2011, plus the full Band 4 Site Manager salary for the last two
months of 2011. SAC ¶ 60.  Third, Riley seeks the full annual salary of Band 4 Site Manager for
2012; and fourth, he seeks half a year's worth of the Band 4 Site Manager Salary.  SAC ¶ 60.

[15] Section 1988 states in pertinent part:  "In any action or proceeding to enforce a provision of
section[] 1981 . . . of this title, the court, in its discretion, may allow the prevailing party, other
than the United States, a reasonable attorney's fee as part of the costs . . . ." 42 U.S.C. § 1988(b).

In considering a motion to dismiss, a court must assume the facts alleged in the complaint are true and must draw all reasonable inferences in the plaintiff's favor, Burbach Broad. Co. of Del. v. Elkins Radio Corp., 278 F.3d 401, 406 (4th Cir. 2002); however, the court is not required to "assume the veracity of bare legal conclusions." Burnette v. Fahey, 687 F.3d 171, 180 (4th Cir. 2012) (internal quotation marks omitted). "Judgment should be entered when the pleadings, construing the facts in the light most favorable to the non-moving party, fail to state any cognizable claim for relief, and the matter can, therefore, be decided as a matter of law." O'Ryan v. Dehler Mfg. Co., Inc., 99 F. Supp. 2d 714, 718 (E.D. Va. 2000). In addition, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." Iqbal, 556 U.S. at 679. Accordingly, parties must "nudge[] their claims across the line from conceivable to plausible" to survive a Rule 12(b)(6) motion. Twombly, 550 U.S. at 570.

For fraud claims, "[i]n addition to the general pleading requirements of Rule 8, the 'circumstances' of fraud must be pled with particularity, except that allegations of scienter only need to be alleged generally." Id. at *3 (citing Fed. R. Civ. P. 9(b)). Specifically, "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby" must be alleged to satisfy Rule 9(b). Id. (quoting Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999)). The purposes of the heightened particularity standard for fraud "are to provide the defendant with sufficient notice of the basis for the plaintiff's claim, to protect the defendant against frivolous suits, to eliminate fraud actions where all of the facts are learned only after discovery, and to safeguard the defendant's reputation." Grant v. Shapiro & Burson, LLP, 871 F. Supp. 2d 462, 468 (D. Md. 2012).

### B. <u>Alter Ego Theory</u>

Plaintiffs brought this action solely against the parent corporation on the theory that the parent controls all of the relevant subsidiaries, including plaintiffs' direct employer, and therefore can be held liable for the latter's alleged wrongdoing.  The caption on the original Complaint named the defendant as "DynCorp International, Inc[.], aka DynCorp International, LLC, Dba DynCorp International FZ-LLC."  It was therefore styled as a single-defendant action, and as such, DynCorp LLC and DynCorp FZ were never served.  Plaintiffs styled the First Amended Complaint as against "DynCorp International, Inc[.], <u>et al.</u>" but failed to formally add any additional parties.  The Second Amended Complaint named the defendant as "DynCorp International, Inc[.], aka DynCorp Internationa, [sic] LLC."  Defendant DynCorp Inc. waived service on behalf of itself and on behalf of its wholly-owned subsidiary, DynCorp LLC, out of an abundance of caution due to the unclear pleadings.  Defendant argues that DynCorp FZ is a separate foreign limited liability company that has not been sued in this matter.

Plaintiffs' entire case rests on their alter ego theory of liability because they have held to their decision not to name DynCorp LLC or DynCorp FZ as parties to this action.  Therefore, their ability to recover depends entirely on their ability to prove that DynCorp LLC's or DynCorp FZ's actions are attributable to defendant DynCorp Inc.  Defendant has continued to press its argument that plaintiffs have sued the wrong entity in this action.  The plaintiffs' own declarations, attached to their opposition brief, clearly acknowledge that all the plaintiffs signed employment contracts with either DIFZ or DynCorp LLC and that all their substantive interactions were either with DynCorp LLC's headquarters in Texas or with management in Afghanistan but not with anyone in Virginia.  <u>See</u> Pls.' Opp'n, Exs. 1-5.  For example, in his Declaration, Riley stated that "[a]ll of [his] dealings with actual persons in authority occurred either in Afghanistan or in Fort Worth, Texas" and that he "knew the entity [he] was dealing

13

with . . . was DynCorp International, LLC out of Texas." Pls.' Opp'n, Ex. 5 ¶¶ 7, 9 (Riley's Declaration). The four other plaintiffs all make identical statements in their declarations regarding dealing exclusively with authority figures in Afghanistan or Fort Worth, Texas. See id., Ex. 1 ¶¶ 8, 10 (Harmon's Declaration); id., Ex. 2 ¶¶ 7, 9 (Smith's Declaration); id., Ex. 3 ¶¶ 6, 8 (Shack's Declaration); id., Ex. 4 ¶¶ 7, 9 (Alford's Declaration). The only references in the SAC to plaintiffs' involvement with DynCorp Inc. are references to plaintiffs' counsels' unsuccessful efforts to negotiate settlements. See SAC ¶¶ 27, 39, 46, 49, 57.

Even assuming that the plaintiffs have adequately pleaded facts establishing the plausibility that DIFZ was merely an alter ego for DynCorp LLC, the Texas entity, they have not named DynCorp LLC as a defendant. Moreover, they have clearly failed to allege sufficient facts to make out a plausible claim that DynCorp LLC is the alter ego of DynCorp Inc., the Virginia entity, and the only named defendant. Plaintiffs have also failed to allege sufficient facts to plausibly show that DynCorp Inc. had any involvement in the events giving rise to this action or that it should be liable for the conduct of either DynCorp LLC or DIFZ, as can be seen from the following allegations, which are the SAC's sole allegations regarding plaintiffs' alter ego claim against DynCorp Inc.:

- "DynCorp International, the Defendant herein, controlled [DIFZ] . . ., but . . . the real employer and alter ego of [DIFZ], was DynCorp International[,] Inc., the Defendant hereunder." SAC ¶ 12.

- "All of the actions taken against the Plaintiffs were done at the instigation of DynCorp International, LLC management out of Fort Worth, Texas or DynCorp International, Inc. Headquarters in Falls Church, Virginia." SAC ¶ 14(a).

- "There was an integration of operations between DynCorp International, Inc. and the offshore company [DIFZ], and DynCorp International, LLC." SAC ¶ 14(c).

- "None of the capital structure or management of [DIFZ] was independent of the operations of DynCorp International, Inc., and all decisions were made or

controlled by DynCorp International, Inc. management in the United States.  SAC ¶ 14(e).

- "The operations of DynCorp International, Inc. and DynCorp International, LLC and [DIFZ] were interrelated, and they shared management." SAC ¶ 14(*l*).

The SAC follows up these overarching allegations by repeating the following three allegations within each count:

- "[DIFZ] is the alter ego of DynCorp International, Inc. and is controlled by DynCorp International, LLC or DynCorp International, Inc. in the United States." E.g., SAC ¶¶ 75, 95, 109.

- "The Defendant has used different entities such as the off shore entity, [DIFZ], DynCorp Technical Services, and Computer Sciences Corporation to obtain benefits to itself under government contracts with the United States while holding out to Plaintiffs . . . that they are dealing with DynCorp International, Inc. or DynCorp International, LLC the United States entity." E.g., SAC ¶¶ 76, 96, 110.

- "The Defendant DynCorp International, Inc. and DynCorp International, LLC so controls the operation of [DIFZ], which makes it a mere instrumentality of the corporation and that such control is used for the purpose of committing fraud or perpetrating the violation of a statutory or other legal duty . . . requiring DynCorp International, LLC or DynCorp International, Inc. to abide by anti-discrimination laws of the United States relating to race, color or national origin." E.g., SAC ¶¶ 77, 97, 111.

Taken together in the light most favorable to plaintiffs, these allegations are insufficient to state a plausible alter ego theory against DynCorp Inc., the Virginia entity, and they are entirely conclusory.[16] Even if the Court were to find that plaintiffs made a plausible showing that DynCorp Inc. is the proper party to this action, all of plaintiffs' claims fail for the additional reasons explained below.

---

[16] The SAC contains additional alter ego allegations that are insufficient because they fail to specify to which entities the allegations refer.  Compare SAC ¶ 14(g) (providing that an example of "the close interplay between the companies is the similarities between key documents and forms used by the two entities" but not indicating which two entities), and SAC ¶ 14(k) (referring to the "two companies' operations" being intertwined without clarifying which two companies), with SAC ¶ 14(*l*) (describing all three relevant entities, DynCorp Inc., DynCorp LLC, and DIFZ, as being "interrelated" and sharing management).

### C. Forum Selection Clause

In addition to its argument that plaintiffs have sued the wrong party, defendant argues that the SAC should be dismissed because nearly all of the relevant written agreements include a forum-selection clause designating Dubai, United Arab Emirates, as the exclusive forum for resolving employer-employee disputes. Plaintiffs do not deny the presence of such clauses in their respective agreements, nor do they deny that the clauses are broad enough in scope to encompass the claims made in the instant action. Instead, plaintiffs argue that the burden is on the defendant to persuade the Court to enforce the forum selection clauses and that the Court must conduct an evidentiary hearing before deciding the issue. Plaintiffs also argue that the forum selection clauses in their FSEAs were the result of unequal bargaining power.[17]

The Supreme Court recently established the proper procedure for a civil defendant to follow to enforce a forum selection clause. See Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas, 134 S. Ct. 568, 579-80 (2013). In Atlantic Marine, the Supreme Court explained that "a valid forum-selection clause [should be] given controlling weight in all but the most exceptional cases" and that the analysis is the same regardless of whether the forum selection clause points to a federal or nonfederal forum. Id. at 580 (quotation omitted) (alteration in original). If the forum selection clause points to a state or foreign forum, the defendant can enforce it through the doctrine of forum non conveniens. Id. In determining whether to enforce a valid forum selection clause, "the plaintiff must bear the burden of showing why the court should not transfer the case to the forum to which the parties agreed." Id. at 581-82. A forum

---

[17] Plaintiffs also argue that three of them signed FSEAs with DynCorp LLC that contained clauses selecting Virginia as the exclusive forum to bring claims arising out of those contracts. Two of those three plaintiffs, however, are not bringing claims related to the time period during which they were employed by DynCorp LLC. Only Riley arguably can rely on the Virginia forum selection clause in his August 2011 FSEA with DynCorp LLC.

selection clause is valid "absent a showing that the chosen forum is unreasonable or was imposed by fraud or unequal bargaining power." Vulcan Chem. Technologies, Inc. v. Barker, 297 F.3d 332, 339 (4th Cir. 2002) (citing Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 10 (1972); Paul Bus. Sys., Inc. v. Canon U.S.A., Inc., 397 S.E.2d 804, 807 (Va. 1990)).

The forum selection clauses contained in plaintiffs' FSEAs designating Dubai as the exclusive forum for plaintiffs' present claims are unreasonable. There is no connection between any underlying event and the United Arab Emirates ("UAE"): plaintiffs are all citizens and residents of the United States; all relevant events occurred in Afghanistan; and all of the instant claims arise from interactions plaintiffs had with those in Afghanistan and those at DynCorp LLC's headquarters in Texas. Plaintiffs plausibly argue that it would be "so gravely difficult and inconvenient that they will be deprived of their day in court" if they must litigate their claims in the UAE due to the distance and the substantial difference between the UAE and American legal systems. See Pls.' Opp'n 11. Moreover, plaintiffs have cited to a website indicating that only employment contracts written in Arabic—which plaintiffs' contracts are not—are considered valid in the UAE. See id. at 14. Defendant has not rebutted these assertions and argues in favor of the clauses' enforceability on the grounds that it is plaintiffs' burden to show that the clauses are invalid and, defendant argues, plaintiffs have not met their burden. Therefore, on the record before the Court, the Dubai forum selection clauses are unreasonable and unenforceable.

Although the Court finds that the Dubai forum selection clauses are not enforceable for the purposes of this litigation, all of plaintiffs' counts fail to state a valid claim under Rule 12(b)(6) for the reasons to follow.

### D. **Count I: Breach of Express and Implied Contracts**

Plaintiffs collectively claim that defendant "formed both express and implied contracts to pay the Plaintiffs commensurate pay[] for jobs which [defendant] required the Plaintiffs to

perform, and thereafter refused to pay for." Pls.' Opp'n 15. Specifically, plaintiffs allege that

they had oral "agreements under their written agreements," SAC ¶ 71, and they contend that

because the oral agreements were made "under" the written FSEAs, Virginia's five-year statute

of limitations for written contracts applies to all of their contract claims. Pls.' Opp'n 16.

It is undisputed that all five plaintiffs had written employment contracts that described

their positions and rates of pay. Each FSEA contained a full integration clause stating the

following language, or something substantially similar:

> Employee represents and acknowledges that, in agreeing to the terms of this
> Contract and that in executing this Contract, Employee does not rely and has not
> relied upon any written or oral representation or statement made by the Employer
> or by any of the Employer's agents, employees, or representatives, including
> statements made by Employer recruiters, other than the terms specifically stated
> in this written Contract, and that this Contract sets forth the entire agreement
> between the parties hereto and fully supersedes any and all prior agreements or
> understandings, written or oral, between the parties hereto pertaining to the
> subject matter hereof. This Contract is intended to be the final expression of the
> agreement between the parties as well as the complete and exclusive statement of
> the terms of the agreement between the parties.

See, e.g., Def.'s Mem., Ex. 1 ¶ 22 (Harmon's December 2009 FSEA).[18] Because every FSEA

that was signed by each plaintiff contains such clear integration language, plaintiffs fail to state a

_____

[18] For example, Smith's August 2011 and January 2012 FSEAs contained the following
integration clause that is nearly identical to the one quoted above:

> Employee represents and acknowledges that, in agreeing to the terms of this
> Contract and that in executing this Contract, Employee does not rely and has not
> relied upon any written or oral representation or statement made by any of the
> Employer's or Customer's agents, employees, or representatives, including
> statements made by Employer's or Customer's recruiters, other than the terms
> specifically stated in this written Contract, and that this Contract sets forth the
> entire agreement between the Parties hereto and fully supersedes any and all prior
> agreements or understandings, written or oral, between the Parties hereto
> pertaining to the subject matter hereof. This Contract is intended to be the final
> expression of the agreement between the Parties as well as the complete and
> exclusive statement of the terms of the agreement between the Parties.

Def.'s Mem., Ex. 4 ¶ 21; Def.'s Mem., Ex. 5 ¶ 21.

valid claim regarding the alleged oral and implied contracts. Moreover, nearly every plaintiff signed a FSEA containing an integration clause after their claims arose for failure to pay the increased rates associated with their alleged promotions. In other words, after plaintiffs were allegedly promoted and worked for a portion of time without receiving the accompanying pay raise, they nevertheless signed new FSEAs, which contained a full integration clause acknowledging that the employee had no prior agreements for other positions or pay rates and acknowledging that the employee was agreeing to work in the position and for the pay rate stated in the present FSEA for the effective length of that FSEA. Therefore, none of plaintiffs' breach of contract claims state valid claims for relief and will be dismissed.[19]

### E. Count II: Racial Discrimination Under 42 U.S.C. § 1981

Count II raises claims against defendant under 42 U.S.C. § 1981, which provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . ." Courts have interpreted this language to prohibit "discrimination in private employment on the basis of race," McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 285 (1976), much like Title VII. For this reason, the substantive elements of a § 1981 claim are treated as identical to the elements of an employment discrimination claim under Title VII. See Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184 (4th Cir. 2001). It follows that to state a claim for discrimination under § 1981, a plaintiff must show that she suffered an adverse employment action under circumstances that could give rise to an inference of intentional discrimination on the basis of race, Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 318 & n.4 (4th Cir. 2005), or else proceed under the familiar McDonnell

---

[19] Because the clear language of the integration clauses bars plaintiffs' breach of contract claims, the Court need not address the parties' arguments regarding the implied contract claims and the applicable statute of limitations.

Douglas burden-shifting framework.[20]  The most common evidence of circumstances suggesting discrimination is that of disparate treatment, whereby a plaintiff shows that she was treated less favorably than similarly situated employees of a different race.  To state a claim for retaliation under § 1981, a plaintiff must allege that she engaged in a protected activity, contemporaneously or shortly thereafter suffered an adverse action at the hands of her employer, and that a causal link exists between the adverse action and the protected activity.  Spriggs, 242 F.3d at 190.

Plaintiffs collectively claim that they were induced to perform certain job duties but were denied commensurate pay on the basis of their race.  See SAC ¶ 81.  Specifically, plaintiffs discrimination claims rest on the bare assertion that defendant "[gave] promotions to non-African Americans and [paid] for work performed in those positions of promotion."  SAC ¶ 82.  After multiple amendments of their complaint, plaintiffs still fail to allege sufficient facts or identify comparators.  Their retaliation claim is similarly insufficient.  Plaintiffs simply allege that their complaints to management regarding commensurate pay eventually led to their termination.  See SAC ¶ 85.  Because they do not allege that any plaintiff complained of race being a factor in their pay issues, they have not alleged that they engaged in protected activities.  Count II further claims that defendant "allow[ed] display [sic] of offensive racial epithets directed at African-Americans and creat[ed] an environment that was hostile to African-Americans in Afghanistan."  SAC ¶ 83.

---

[20] Under the McDonnell Douglas burden-shifting analysis, the plaintiff carries an initial burden to establish a prima facie case of discrimination.  A party alleging discriminatory contract termination may survive a motion to dismiss by alleging sufficient facts indicating that the defendant terminated a contract with the plaintiff, who was within a protected class and whose performance under the contract met the defendant's legitimate expectations, and that the defendant instead contracted with a person not in the plaintiff's protected class.  See Holland v. Washington Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007).

Defendant's sole argument for dismissal of the racial discrimination claims is that § 1981 does not apply extraterritorially to allegedly discriminatory acts that occurred overseas. The law supports defendant's argument. By its terms, § 1981 only confers substantive rights on "persons within the jurisdiction of the United States," and there is "nothing in the structure or history of § 1981 [that] suggests . . . Congress intended the statute to reach discrimination against individuals outside the territorial jurisdiction of the United States." Ofori-Tenkorang v. Am. Int'l Grp., Inc., 460 F.3d 296, 301 (2d Cir. 2006) (conducting an extensive historical analysis). In addition, courts must apply a "legal presumption that Congress ordinarily intends its statutes to have domestic, not extraterritorial, application." Small v. United States, 544 U.S. 385, 388-89 (2005). On these bases, courts which "have considered the question have unanimously agreed that [§ 1981] does not apply outside the United States," Ofori-Tenkorang, 460 F.3d at 302 (collecting cases), including the District of Maryland, see Dosso v. British Airways, PLC, No. AW-07-2710, 2010 WL 3002077, at *1 (D. Md. July 29, 2010).

As alleged in the SAC, all of the relevant allegedly discriminatory acts occurred in Afghanistan, where plaintiffs were stationed for the entirety of the periods in question alongside the supervisors who feature prominently in their allegations. In other words, plaintiffs endured the allegedly disparate and racially offensive treatment in Afghanistan, the site where all the alleged deprivations of promotion and commensurate pay occurred. Plaintiffs' employment was terminated while plaintiffs were in Afghanistan and only thereafter did plaintiffs return to the United States. In response, plaintiffs offer only the most tenuous stateside contacts, arguing that defendant "in its recruiting of plaintiffs from Texas, Georgia, and Alabama discriminated in Contracting." SAC ¶ 86. There is no specific allegation as to what was discriminatory about how plaintiffs were hired. Plaintiffs also argue that they each demanded back pay from the

entity in Virginia once they returned to the United States and that "[s]imilarly situated individuals who were not African-Americans[] made such demand on DynCorp while in the United States after termination of their employmen[] for payment for their work in higher paying positions in Afghanistan and were paid by DynCorp in the United States." SAC ¶¶ 89-90. These allegations are not sufficient to confer rights under § 1981 and fail to allege with any specificity what discriminatory decisions were actually made in the United States. In addition, by plaintiffs' own pleadings, any racially hostile work environment would have been created in Afghanistan, where plaintiffs exclusively worked. Lastly, plaintiffs' claims regarding displays of offensive racial epithets are inapposite because the only supporting factual allegations refer to other court decisions and not to any epithets directed at or seen or heard by any of the plaintiffs in this action. See SAC ¶¶ 62-64.

Because all of the material underlying events occurred in Afghanistan, the limited reach of § 1981 dooms plaintiffs' Count II claims, which will be dismissed.

### F.  Count III:  Intentional and Negligent Misrepresentation

The gist of plaintiffs' misrepresentation claims is that the defendant induced them to perform additional duties associated with new positions by falsely representing that they would be compensated at the standard rate for such positions, as set forth in defendant's published pay schedule. SAC ¶¶ 100-08. Plaintiffs allege that they relied on defendant's promises and in fact performed the additional duties to their financial detriment. SAC ¶ 105. Defendant responds that several of the plaintiffs are time-barred from asserting such claims, that their allegations lack the requisite specificity under Rule 9(b), and that the economic loss rule precludes the claims in any event.

The parties dispute whether Virginia's two-year statute of limitations or Texas' four-year statute of limitations applies to the claims in Count III.  Plaintiffs—who chose to file this suit in

the Eastern District of Virginia—argue that the Texas limitations period governs because the

"most significant contacts between the Plaintiffs and the laws of any state herein are with

Texas."[21] Pls.' Opp'n 22.  Defendant, on the other hand, correctly argues that Virginia's

limitations period governs because a federal court exercising supplemental jurisdiction applies

the choice of law rules of the forum state, East West, LLC v. Rahman, 873 F. Supp. 2d 721, 727

(E.D. Va. 2012) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941)), and

"[i]n Virginia, it is well-settled that the limitations period is treated as a procedural issue

governed by Virginia law," Hunter Innovations Co. v. Travelers Indem. Co. of Conn., 753 F.

Supp. 2d 597, 602 (E.D. Va. 2010) (citing Hansen v. Stanley Martin Cos., 585 S.E.2d 567, 571

(Va. 2003)).  Therefore, Virginia's two-year statute of limitations for fraud, see Va. Code Ann.

§ 8.01-243(A), applies to the claims in Count III.

The original complaint in this action was filed on December 31, 2013; accordingly, any

fraud claim that accrued before December 31, 2011, is time barred.  Harmon resigned in

November 2011 and the alleged fraudulent inducements to perform additional work without

commensurate pay were made before her resignation.  Therefore, Harmon's misrepresentation

claims are untimely.  Smith alleges she was promoted on June 20, 2011, but that she did not start

receiving an increased salary until September 2011.  A claim for an alleged fraudulent

---

[21] In support of their argument that Texas' limitations period applies to their tortious
misrepresentation claims, plaintiffs inexplicably quote from the contracts chapter of the
Restatement (Second) of Conflict of Laws (the "Second Restatement").  See Pls.' Opp'n 22.
Plaintiffs argue that, under § 187 of the Second Restatement, the Dubai choice of law clauses in
their FSEAs are unenforceable.  See id. at 22-23.  Plaintiffs then argue—without support—that
because the Dubai clauses are unenforceable, Texas law must govern because Texas "has the
most direct involvement in the events at issue."  Id. at 23.  The lone case cited for plaintiffs'
reliance on the Second Restatement was an appeal from the District Court of Maryland.  See
Ciena Corp. v. Jarrard, 203 F.3d 312 (4th Cir. 2000).  The Ciena Corp. court applied Maryland's
choice of law rules, which, unlike Virginia's, subscribe to § 187 of the Second Restatement.  See
id. at 323.

inducement for her to work during that two-month period without additional pay is, therefore, untimely.  Smith also alleges she was promoted sometime after February 2012 and remained in the higher position until November 2012 but never received the appropriate pay increase.  This claim would not be time barred; however, it nevertheless fails for lack of particularity, as explained below.  Shack alleges he was promoted in February 2010 and worked in that higher position for five months but did not receive a commensurate pay raise.  Additionally, his final FSEA expired on December 13, 2011, and was not renewed.  Therefore, his fraud claim is untimely.  Alford was allegedly asked by an unnamed individual to perform the duties of a Travel Supervisor and a "Flight Ops/Aviation Supervisor," both higher paying positions, which she did for an unspecified length of time without receiving additional pay.  Because she does not specify when this occurred, the Court is unable to determine whether the claim is time barred, but the claim will be dismissed because it lacks particularity, as explained below.  Alford further alleges she was relocated in July 2011 and should have received a higher pay rate for that; this claim is also untimely.  Riley alleges that he accepted a promotion to a Site Manager position for a Band 5 base on June 25, 2011, but did not receive the commensurate pay increase until August 2011.  This claim is time barred.  Lastly, Riley was allegedly reassigned to be the Site Manager of a Band 4 base on August 18, 2011, which entitled him to another pay increase that he never received.  His employment was terminated in October 2011.  Therefore, this claim is also untimely.

In addition to nearly all of plaintiffs' misrepresentation claims being time barred, all these claims fail to satisfy Rule 9(b)'s heightened pleading standard, which requires allegations regarding "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby."  Wolf v. Fed. Nat.

Mortgage Ass'n, 512 F. App'x 336, 343-44 (4th Cir. 2013) (internal quotation marks omitted). The remaining two timely fraud claims are (1) Smith's claim that she was promoted sometime after February 2012 and remained in the higher position until November 2012 but never received the appropriate pay increase and (2) Alford's claim that she was asked to perform the duties of a Travel Supervisor and a "Flight Ops/Aviation Supervisor" without receiving additional pay.

The only allegations supporting Smith's claim are that "DynCorp made her apply for the position of Transportation Supervisor" and that she "was assured she would be paid that amount." SAC ¶ 24. These allegations fail to identify the speaker and the time and place of those statements. Similarly, Alford does not allege who asked her to perform the duties of a Travel Supervisor and a "Flight Ops/Aviation Supervisor," nor does she allege where or when she was asked to do so. Moreover, she does not allege the length of time she occupied this position without receiving additional pay. Accordingly, both claims fail to state a valid claim with the particularity required by Rule 9(b).

For these reasons, Count III fails to state a valid claim for intentional or negligent misrepresentation and will be dismissed.[22]

### G. Count IV: Breach of the Covenant of Good Faith and Fair Dealing

"In Virginia, every contract contains an implied covenant of good faith and fair dealing," Enomoto v. Space Adventures, Ltd., 624 F. Supp. 2d 443, 450 (E.D. Va. 2009), which is breached when a party "exercise[s] contractual discretion in bad faith." Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Connecticut, 156 F.3d 535, 542 (4th Cir. 1998). An exception exists, however, for employment contracts—Virginia law "does not recognize a cause of action for

---

[22] Because all of plaintiffs' fraud claims are either time barred or not supported by sufficient specific factual allegations, the Court need not address the parties' disagreement over whether the economic loss rule applies.

breach of an implied covenant of good faith and fair dealing in employment contracts, and in at-will employment contracts in particular." Devnew v. Brown & Brown, Inc., 396 F. Supp. 2d 665, 671 (E.D. Va. 2005).

Here, defendant relies on Devnew and argues that plaintiffs' claim is not cognizable because plaintiffs all signed at-will employment contracts. Def.'s Mem. 23. Plaintiffs acknowledge that employment contracts "normally do not carry the implied covenant of good faith and fair dealing;" however, they attempt to distinguish Devnew by characterizing their employment contracts as providing defendant with discretionary rights, which defendant exercised in bad faith. See Pls.' Opp'n 25 ("[E]mployment contracts . . . normally do not involve discretionary rights in the at will context. However, DynCorp chose to operate under the terms of the contract by using more discretion on its part, and exercised bad faith therein.").

Plaintiffs' attempt at distinguishing their contracts from "normal" employment contracts falls short. There are no allegations in the SAC that plaintiffs' FSEAs could not be terminated early or could only be terminated for cause, nor could plaintiffs make such allegations in light of the clear language in all of their FSEAs stating that either the employee or the employer could terminate the contract with or without cause at any time. See, e.g., Def.'s Mem, Ex. 1 ¶ 17; id., Ex. 3 ¶ 17; id., Ex. 6 ¶ 17; id., Ex. 8 ¶ 17; id., Ex. 13 ¶ 17. Plaintiffs' were clearly in an at-will contractual employment relationship with their employer and, therefore, no covenant of good faith and fair dealing was implied into any of their employment contracts. Any claim that they were induced into performing additional work by false oral representations that they would receive an increase in pay is best characterized as fraudulent misrepresentation, which is also not cognizable under the circumstances for the reasons discussed above. Moreover, plaintiffs' allegations are the definition of conclusory, offering no explanation of the manner in which

defendant breached the covenant. See SAC ¶¶ 114-15 ("Defendant entered into express agreements to employ Plaintiffs in Afghanistan in exchange for pay according to their schedule of pay for particular positions under LOGCAP and other contracts. Defendant breached the covenant of good faith and fair dealing implicit in every contract with Plaintiffs. As a direct and foreseeable result of Defendant's breach, Plaintiffs have been damaged in not receiving payment of the wages called for in the positions and work performed . . . ."). For these reasons, Count IV fails to state a cognizable claim and will be dismissed.[23]

## H. Count V: Promissory Estoppel

In the event that valid contracts did not exist between the parties beyond the written agreements, plaintiffs claim that defendant should be estopped from reneging on its promise to pay them a commensurate salary for the additional duties they performed in reliance on that promise. See SAC ¶¶ 121-26. Plaintiffs also argue that their promissory estoppel claim is valid under Texas law. As previously discussed, a federal court exercising its supplemental jurisdiction applies the choice of law rules of the forum state. Defendant correctly argues that Virginia's choice of law rules would decline to apply Texas law to a claim of promissory estoppel.

Virginia law "does not recognize the claim of promissory estoppel among its equitable claims." R.T.O., Inc. v. Santa Barbara Bank & Trust, N.A., 6 Va. Cir. 62 (2012). In R.T.O., the court held that "Virginia does not allow the application of a [contractual] choice-of-law provision to a claim of promissory estoppel," emphasizing that "there is a clear policy against promissory estoppel in Virginia." Id. Applying its holding to the choice of law provision at issue, the court concluded, "Virginia does not recognize promissory estoppel as a cause of action

---

[23] Because all of plaintiffs' misrepresentations claims are invalid for the above reasons, the Court need not address the parties' arguments regarding the economic loss rule.

and thus has a strong interest in restricting the use of promissory estoppel claims in its legal system. Therefore, the choice-of-law provision will not apply to a claim of promissory estoppel." Id. at *4. Accordingly, the court sustained the defendant's demurrer to the promissory estoppel claim at issue in that case.

In sum, Virginia law does not recognize plaintiffs' promissory estoppel claim, and Virginia's choice of law rules will not apply another state's law to allow a promissory estoppel claim to go forward. Count V will, therefore, be dismissed.

## I.   Counts VI and VII:  Unjust Enrichment and Quantum Meruit

Plaintiffs claim that defendant unjustly received the benefits of the valuable services they performed without paying plaintiffs for those additional services. See SAC ¶¶ 132-35, 142-44. Defendant argues that these claims should be dismissed because they are barred under Virginia law by plaintiffs' express written contracts and because many of plaintiffs' allegations rest on facts occurring outside of Virginia's limitations period. Plaintiffs respond that Counts VI and VII are valid alternative claims in the event that their contract claims are found defective.

As discussed above with respect to plaintiffs' contract claims, plaintiffs' employment was governed at all relevant times by their written FSEAs. Under Virginia law, plaintiffs cannot recover under their equitable claims for unjust enrichment or quantum meruit in the face of their valid, express FSEAs. See Weiler v. Arrowpoint Corp., No. 1:10cv157, 2010 WL 1946317, at *9 (E.D. Va. May 11, 2010) (granting motion to dismiss unjust enrichment and quantum meruit claims where enforceable written contract existed). For these reasons, Counts VI and VII will be dismissed.[24]

---

[24] Because the Court will dismiss all of the counts in the Second Amended Complaint, it need not address the parties' arguments regarding the statute of limitations for plaintiffs' equitable claims, punitive damages, prejudgment interest, and plaintiffs' waiver of their right to a jury trial.

## III.   CONCLUSION

For the reasons stated above, Defendant's Motion to Dismiss Plaintiffs' Second Amended

Complaint [Dkt. No. 48] will be granted by an appropriate Order to be issued with this

Memorandum Opinion.

Entered this _6_ day of February, 2015.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge